UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ARAM J. PEHLIVANIAN, Individually and              :
On Behalf of All Others Similarly Situated,         :
                                                    :
                        Plaintiff,                  :
                                                    :
            - against -                             :              **OPINION AND ORDER**
                                                    :              14 Civ. 9443 (ER)
CHINA GERUI ADVANCED MATERIALS                      :
GROUP, LTD., MINGWANG LU, EDWARD                    :
MENG, YI LU, HARRY EDELSON, J.P. HUANG, :
KWOK KEUNG WONG, YUNLONG WANG,                      :
and MAOTONG XU,                                     :
                                                    :
                        Defendants.                 :
------------------------------------------------------------------x

Ramos, D.J.:

        This case arises out of alleged violations of the Securities Exchange Act of 1934 (the

"Exchange Act") by China Gerui Advanced Materials Group, Ltd. ("China Gerui" or "the

Company") and eight of its current and former Directors and Officers ("Individual Defendants"

and collectively, "Defendants").  The Amended Complaint alleges that Defendants made

material misstatements and/or omissions relating to China Gerui's expenditure of approximately

$234 million to purchase antique Chinese porcelain in violation of Sections 10(b) and 20(a) of

the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5.[1]   Lead

Plaintiff, Aram J. Pehlivanian ("Pehlivanian"), brings suit on behalf of a class of all those who

purchased or otherwise acquired China Gerui securities between January 11, 2012 and

September 4, 2014 (the "Class Period"), and sustained losses upon the revelation of alleged

corrective disclosures (the "Class").  Pending before this Court is China Gerui's and Individual

---

[1] Plaintiff also brought a claim for fraudulent concealment, but withdrew the claim in its Opposition to Defendants'
Motion to Dismiss ("Opposition").  *See* Pl.'s Opp'n Mem. at 1 n.2.

Defendant, Harry Edelson's ("Edelson"), motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiff's motion to lift the automatic stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  For the reasons set forth below, China Gerui's and Edelson's motion to dismiss is GRANTED and Plaintiff's motion to lift the automatic stay is DENIED as moot.

## I.    Factual Background[2]

### a.    The Defendants

China Gerui is a steel processing company based in China and incorporated under the laws of the British Virgin Islands that produces high-end, high-precision, ultra-thin, high-strength, cold-rolled steel products for sale internationally and domestically.  Am. Compl. ¶¶ 2, 14.

As of the date of this Order, the only Individual Defendant that has been served is Edelson.  *See* Docs. 9, 37 (extending the time to serve the Individual Defendants, excluding Edelson, until February 1, 2016).  Edelson has been a director of China Gerui since 2009 and previously served as Chief Executive Officer and Chairman of the Board of Directors of China Gerui's predecessor corporation.  Am. Compl. ¶ 18.  Edelson has received $10,000 a month from China Gerui since 2010 for his services promoting awareness of the Company within the investment community, participating in road shows and investor conferences, and providing the Company with office space and communications facilities.  *Id.*

---

[2] The following factual background is based on the allegations in the Amended Complaint, Doc.3, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  In addition, the Court considers documents incorporated by reference, legally required public disclosure documents filed with the SEC, any documents that Plaintiff relied upon in bringing the instant action, and any documents the Court may take judicial notice of.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)); *see also infra* Section III.c.

The other seven Individual Defendants are:  (1) Mingwang Lu ("Lu"), Chairman of China Gerui's Board of Directors and Chief Executive Officer; (2) Edward Meng ("Meng"), China Gerui's Chief Financial Officer and previously its Director of Investor Relations; (3) Yi Lu ("Y. Lu"), China Gerui's Chief Operating Officer and a Director; (4) J.P. Huang ("Huang"), a China Gerui Director who serves on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee; (5) Kwok Keung Wong ("Wong"), a former China Gerui Director who served on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee; (6) Yunlong Wang ("Wang"), a China Gerui Director who took Wong's  place on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee; and (7) Maotong Xu ("Xu"), a China Gerui Director and the Chair of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee.  *Id.* ¶¶ 15-23.

### b.  The Chinese Steel Market

In 2010, the Chinese steel industry was the largest in the world, accounting for 45.7% of global steel output.  *Id.* ¶ 24.  However, years of growth lead to a "glut of capacity."  *Id.*  As a result of these capacity problems, heavy losses in the steel industry were anticipated and did occur in late 2010.  *Id.*  In addition to the capacity issues, the Chinese steel industry was unable to negotiate favorable pricing on the raw materials required to make steel because of its heavy fragmentation.  *Id.*  The Chinese government announced a five year plan to reduce capacity, decrease pollution, and improve China's bargaining position in an attempt to bolster the steel industry.  *Id.* ¶ 25.

### c.  China Gerui's Allegedly False and Misleading Statements

Plaintiff contends that Defendants made false and misleading statements, discussed in detail below, regarding China Gerui's growth strategy, fiscal strategy, and unrestricted cash holdings when it failed to disclose its intention to use a significant portion of its cash holdings to allegedly acquire a collection of Chinese porcelain (the "Collection").  *Id.* ¶ 8.

On October 17, 2011, China Gerui's Chairman of the Board, Lu, issued the 2010 Annual Report Letter to Shareholders.  *Id.* ¶ 26; Affirmation of Shawn P. Thomas in Support of Defendants' Motion to Dismiss ("Thomas Aff.") Ex. 1.  The letter reported the Company's strong performance while also acknowledging the declining Chinese steel industry.  Am. Compl. ¶ 26.  Lu stated that it was his belief that the high-precision, cold-rolled, narrow-strip steel market China Gerui supplied did not have capacity issues and that demand would continue to grow with the Chinese economy.  *Id.*  The Company disclosed that it expected to increase its steel capacity by the end of 2011.  *Id.*  China Gerui's 2010 Annual Report, which accompanied the shareholder letter, stated that as of December 31, 2010, China Gerui held $119.5 million in unrestricted cash and $66.5 million in restricted cash and that it was reserving the use of its cash for its capital expansion program.  *Id.* ¶ 27; Thomas Aff. Ex. 1.

Three months later, on January 11, 2012, Edelson allegedly touted China Gerui's "growing cash trove of $225 million" and its seemingly minimal downside, high upside, and "inevitable" higher ratio of price to earnings in an article titled "Warren Buffet Would Love Special Situation Company China Gerui" published on the website Seeking Alpha.  Am. Compl. ¶ 28; Thomas Aff. Ex. 19.

On October 18, 2012, China Gerui issued its 2011 Annual Report Letter to Shareholders from Lu.  Am. Compl. ¶ 29; Thomas Aff. Ex. 2.  The 2011 letter disclosed declines in China

Gerui's average sales price and volume as a result of the slowing Chinese economy.  *Id.* ¶ 29.  To address these concerns, China Gerui discussed its efforts to diversify its outputs, including by increasing its output of chromium-plated products, and indicated that its expansion into these products "would improve its ability to service existing customers, acquire new customers, and, presumably, weather the economic headwinds[.]"  *Id.*  China Gerui also stated that it would diversify its revenue stream by expanding to overseas markets in order to "overcome the challenging environment."  *Id.*  The 2011 Annual Report, which again accompanied the shareholder letter, disclosed that as of December 31, 2011, the Company held $246.6 million in unrestricted cash, $118.1 in restricted cash, and $3.2 million in certificates of deposits and again stated that it reserved this cash for use in its capital expansion program.  *Id.* ¶ 30; Thomas Aff. Ex. 2.

On May 13, 2013, the Company issued a press release disclosing that had it entered an agreement with Cambelle-Inland, LLC ("Cambelle") on May 1, 2013 for Cambelle's assistance in developing and executing "a global growth, operational and acquisition strategy" for China Gerui.  Am. Compl. ¶¶ 31, 32; Thomas Aff. Ex. 5.  China Gerui explained that it planned to "globalize [its] business through accretive acquisitions[,]" noting that it had long communicated that acquisitions or potential joint ventures were part of the Company's long-term growth strategy to capture market share and broaden its end-user applications, but that it would also "continu[e] to focus on organic growth opportunities."  Am. Compl. ¶ 32.

On October 31, 2013, China Gerui issued its 2012 Annual Report Letter to Shareholders from Lu.  *Id.* ¶ 33; Thomas Aff. Ex. 3.  The letter disclosed decreases in the Company's revenue, gross profit, and gross margin from 2011 to 2012.  Am. Compl. ¶ 33.  Despite these decreases, China Gerui reiterated its plan to evolve into higher-margin sectors and to build new product

pipelines of laminated and chromium-plated products to obtain a larger product mix, a more diversified customer base, and to expand its international business. *Id.* China Gerui also stated that it would continue investigating potential acquisitions and joint ventures as a way to "more rapidly diversify[] its product mix and gain[] market share." *Id.* China Gerui's 2012 Annual Report, attached to the shareholder letter, also disclosed that as of December 31, 2012, the Company had $228.9 million in unrestricted cash, $145.4 million in restrict cash, and $19.6 million in certificates of deposit. *Id.* ¶ 34; Thomas Aff. Ex. 3.

On March 20, 2014, China Gerui held a "Fourth Quarter Fiscal Year 2013 Results conference call," lead by Lu and the Company's Chief Financial Officer, Meng, to discuss its declining financial performance and its efforts to address the decline. Am. Compl. ¶ 35; Thomas Aff. Ex. 16. Lu characterized China Gerui's presumably negative fourth quarter results as reflective of "slow economic growth, overcapacity, and the ongoing weak demand for steel products in China." Am. Compl. ¶ 35. Despite these results, the Company disclosed that as of December 31, 2013 it held $237.1 million in unrestricted cash, $114.8 million in restricted cash, and $24.2 million in current certificates of deposit. *Id.* ¶ 37. Meng stated that the Company would continue to be "fiscally disciplined with its cash resources [because of] the working capital intensive nature of the steel industry." *Id.* According to Plaintiff, Meng also "intimated" that it intended to carefully manage its cash resources to "opportunistically capitalize on the investments and/or assets that would generate a higher return on invested capital" while also balancing its efforts to "'build[] investor confidence' in [its] stock through the Company's share repurchase program." *Id.* ¶ 38; Thomas Aff. Ex. 16 (Meng stating that "[w]hile we are [sic] recognize the importance of building investor confidence in our stock, we have to carefully manage our cash resources to opportunistically capitalize on the investments and/or assets that

would generate a higher return on invested capital.")  Meng stated his belief that the Company's growth strategy would yield positive results by the end of 2014.  Am. Compl. ¶ 39.

In regards to China Gerui's strategic plans for 2014, Mr. Lu noted that the Company had "put in place strategies to capture growth," including its commitment to "accelerate" its push into higher margin steel products and to expand into new international markets.  *Id.* ¶ 36.  The Company also continued to pursue mergers and acquisitions as a way to increase cash flow, broaden end-user applications, and provide innovation through research and development.  *Id.* Prospective acquisition targets previously considered by China Gerui, however, were not pursued because they did not meet China Gerui's acquisition criteria.  *Id.*

On May 20, 2014, China Gerui held a "First Quarter Fiscal Year 2014 Results conference call" lead by Lu and Meng to discuss the Company's financial performance.  *Id.* ¶ 40; Thomas Aff. Ex. 8.  Lu attributed China Gerui's presumably negative performance to "tumultuous performance of the steel sector in China" and a "seasonally slow first quarter."  Am. Compl. ¶ 40.  Despite this performance, the Company disclosed that as of March 31, 2014, it held $230.7 million in unrestricted cash, $75.5 million in restricted cash, and $18.6 million in current certificates of deposit.  *Id.* ¶¶ 5, 44.  According to Meng, the Company would "remain fiscally disciplined with its cash resources given the working capital intensive nature of [its] business." *Id.* ¶ 45.

Regarding China Gerui's plan for the future, Lu noted that it was focused on its "near-term growth strategies with new products and markets."  *Id.* ¶ 41.  China Gerui had begun adjusting its product mix, including increasing its laminated and chromium-plated production, in anticipation of the Chinese government's initiatives, which purportedly would increase the demand for this type of steel.  *Id.*  In fact, China Gerui disclosed that its chromium-plated

production had increased from 49% in the fourth quarter of 2013 to 51% in the first quarter of 2014. *Id.* ¶ 42. China Gerui also expressed its intention to continue cultivating its export business, pursuing potential acquisition targets, despite having no success with several potential targets screened in the past year, establishing higher premium products, and engaging in "sound fiscal management." *Id.* ¶¶ 43, 47.

On May 30, 2014, China Gerui issued a press release claiming that its shares were severely undervalued. *Id.* ¶ 48; Thomas Aff. Ex. 13. The press release linked to an investor presentation, authorized in part by China Gerui, that highlighted the Company's focus on "customized, high value-added, high-margin steel production" and reiterating its long-term growth strategy to double its capacity, broaden its product portfolio, improve efficiency, expand its market share, and pursue acquisitions and strategic partnerships. Am. Compl. ¶ 48.

A press release issued a week later on June 6, 2014, again claimed that China Gerui's shares were "severely undervalued." *Id.*; Thomas Aff. Ex. 6. Plaintiff also characterizes the press release as stating that China Gerui intended to use its cash in the near term to continue its share repurchase program. Am. Compl. ¶ 48.

### d. Disclosure of the Purchase

On September 4, 2014, China Gerui held an earnings conference call and disclosed that it had purchased a collection of antique Chinese porcelain on or before June 30, 2014,[3] allegedly

---

[3] China Gerui allegedly did not disclose the exact date of this purchase. Plaintiff contends that China Gerui's purchase occurred between March 31, 2014 and June 30, 2014 because China Gerui disclosed that as of March 31, 2014, it held $230.7 million in unrestricted cash, $75.5 million in restricted cash, and $18.6 million in current certificates of deposit while as of June 30, 2014, the Company disclosed that its cash holdings decreased to $3 million in unrestricted cash, $76.1 million in restricted cash, and $10.8 million in current certificates of deposits. *See id.* ¶¶ 3, 5, 44, 53. Both parties agree that the Purchase must have occurred on or before June 30, 2014. Pl.'s Opp'n Mem. at 1 n.4; Defs.' R. Mem. at 4.

valued at $905 million, for $234 million, paid for from its unrestricted cash reserves (the "Purchase").  Am. Compl. ¶¶ 3, 50, 51.  The Company explained that:

> Management and the Board of Directors have decided to take advantage of [the Company's] rich cash position to make an alternative investment legally [sic] to provide a better near-term return on capital and cash load support [the Company's] steel operations during the transitional phase of the steel industry restructuring. . . . It is our intention to sell all 206 pieces over time to reinforce our cash position and earn a substantial return.

Id. ¶ 51; Thomas Aff. Ex. 10.  Mr. Meng further explained that the Purchase "capitalize[d] on a unique opportunity to enter the growing antiquities market," which provided a "viable alternative to maximize the long-term cash appreciation of [the Company's] cash assets," Am. Compl. ¶ 54, and that "the potential awards" were "far greater than anything [the Company] can receive in our current metal business in the near future."  Id. ¶ 53.  The Company stated that it planned to use the profit from the sale of the Collection to support its steel operations and previously stated growth strategies.  Id. ¶¶ 52, 55.  China Gerui, however, acknowledged that the Purchase, paid for from its cash reserves, created short-term pressure on its cash position.   Id. ¶¶ 3, 5, 53, 57.  As of June 30, 2014, China Gerui held $3 million in unrestricted cash, $76.1 million in restricted cash, and $10.8 million in current certificates of deposit.  Id. ¶ 53.

Plaintiff contends that this Purchase was "shocking" because in the "years and months" before the September 4, 2014 announcement, China Gerui "consistently and unambiguously" stated that its growth strategy consisted of expanding and diversifying its product line, identifying overseas markets, and undertaking strategic mergers and/or acquisitions.  Id. ¶ 4.  Plaintiff also asserts that China Gerui provided no information regarding exactly when or from who the Collection was purchased, where the Collection is being stored, whether the Collection is insured, or who appraised and authenticated the Collection.  Id. ¶¶ 3, 59.  China Gerui did, however, disclose that the Collection was purchased from a private entrepreneur who was under

financial pressure and was appraised and authenticated by unnamed "Class A certified China arts appraisers" with master level art authentication qualifications. *Id.* ¶ 57. The decision to purchase the Collection was also allegedly made with the support of the Board of Directors and was reported to the Company's auditors and legal counsel. *Id.* ¶¶ 54, 58. Plaintiff claims that his attempts to collect additional information about the Purchase were unsuccessful. *Id.* ¶ 59 n.9.

On the date the Purchase was announced, September 4, 2014, China Gerui's stock price declined approximately 20% from $0.61 per share (pre-split)[4] on September 3, 2014 to $0.49 per share (pre-split). *Id.* ¶¶ 6, 60. As of November 12, 2014, China Gerui's stock price declined 72%— to $1.70 per share (post-split)—from the Company's pre-split stock price on September 3, 2014. *Id.* ¶¶ 7, 62. Shortly thereafter, on January 6, 2015, China Gerui disclosed that it defaulted on several of its bank loans. Thomas Aff. Ex. 11.

According to Plaintiff, since the Company's initial disclosure on September 4, 2014, China Gerui has made no clarifying disclosures regarding the Purchase. Am. Compl. ¶ 7. For example, in China Gerui's 2013 Annual Report Letter to Shareholders dated September 26, 2014, Lu discussed the Company's ongoing growth strategy, including that the Company would continue to maintain strict internal fiscal policy, but made no mention of the Purchase. *Id.* ¶ 61; Thomas Aff. Ex. 18.

## II.    Procedural Background

On November 26, 2014, Pehlivanian, individually and on behalf of purchasers and those that otherwise acquired China Gerui securities between January 11, 2012 and September 4, 2014,

---

[4] On November 6, 2014, China Gerui's Board of Directors approved a one-for-ten reverse stock split meant to raise the Company's share price above the NASDAQ's $1.00 per share listing requirement to avoid being delisted. *Id.* ¶ 6 n.2.

filed a Complaint against China Gerui and the Individual Defendants.  Doc. 1.  On December 5,

2014, Plaintiff filed an Amended Complaint.  Doc 3.

At a conference held before this Court on April 29, 2015, this Court granted

Pehlivanian's motion to be appointed lead plaintiff, Doc. 15, and granted China Gerui and

Edelson leave to file a motion to dismiss the Amended Complaint.  On May 29, 2015, China

Gerui and Edelson filed a motion to dismiss this action in its entirety.  Doc. 23.

At another conference held before this Court on June 17, 2015, the Court granted Plaintiff

leave to file a motion to partially lift the automatic stay imposed by the PSLRA.  Plaintiff's

motion to partially lift the automatic stay was filed on July 13, 2015.  Doc. 31.

## III.    Legal Standard

### a.    Rule 12(b)(6) Motions to Dismiss:  General Legal Standard

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

the court must accept all factual allegations in the complaint as true and draw all reasonable

inferences in the plaintiff's favor.  *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The court is

not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a

cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551).  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief

that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S.

at 556).  More specifically, the plaintiff must allege sufficient facts to show "more than a sheer

possibility that a defendant has acted unlawfully."  *Id.*  If the plaintiff has not "nudged [her]

claims across the line from conceivable to plausible, [the] complaint must be dismissed."
*Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.

The question in a Rule 12 motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

### b.  Heightened Pleading Standard under Rule 9(b) and the PSLRA

Beyond the requirements of Rule 12(b)(6), a complaint alleging securities fraud must satisfy the heightened pleading requirements of the Federal Rule of Civil Procedure 9(b) and the PSLRA by stating the circumstances constituting fraud with particularity. *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319-20 (2007)). Specifically, Rule 9(b) requires that a securities fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *See U.S. ex rel. Kester v. Novartis Pharm.*

*Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014).   Like Rule 9(b), the PSLRA requires that securities fraud complaints "'specify' each misleading statement," set forth the reasons or factual basis for the plaintiff's belief that the statement is misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. §§ 78u–4(b)(1), (2)); *see also, e.g.*, *Slayton v. Am. Express, Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

**c.   Extrinsic Documents**

"When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)), *aff'd sub nom. Lucas v. Icahn*, No. 14 Civ. 1906, 2015 WL 3893617 (2d Cir. June 25, 2015) (summary order); *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).   To be incorporated into the complaint by reference, "the [c]omplaint must make a clear, definite and substantial reference to the documents." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).   The Court may also "take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Silsby*, 17 F. Supp. 3d at 354 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991)); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 Fed. App'x 93 (2d Cir. 2014) (summary order).

China Gerui and Edelson attach the following documents to their motion to dismiss:  (1) China Gerui's annual reports and shareholder letters from 2010, 2011, 2012, and 2013, *see* Thomas Aff. Exs. 1-4, 13, 15, 18; (2) the article titled "Warren Buffet Would Love Special Situation Company China Gerui" written by Edelson and posted on www.seekingalpha.com on January 11, 2012, *id.* Ex. 19; (3) the consulting agreement between China Gerui and Cambelle dated May 1, 2013, *id.* Ex. 14; (4) China Gerui's press releases dated May 13, 2013, May 29, 2014, June 6, 2014, and September 2, 2014, *id.* Exs. 5, 6, 12, 17; and (5) transcripts from China Gerui's earnings or results conference calls dated August 28, 2013, May 30, 2013, March 20, 2014, May 20, 2014, September 4, 2014, and January 6, 2015, *id.* Exs. 7-11, 16.  The Amended Complaint cites and relies on almost all of the attached documents:  (1) the 2010, 2011, and 2012 annual reports and shareholder letters, Am. Compl. ¶¶ 26, 27, 29, 30, 33, 34; (2) the article posted on www.seekingalpha.com, *id.* ¶ 28; (3) the consultant agreement, *id.* ¶ 31; (4) China Gerui's press releases dated May 13, 2013, *id.* ¶ 32, May 30, 2014, *id.* ¶ 48,[5] June 6, 2014, *id.*, and September 2, 2014, *id.* ¶ 49; and (5) transcripts from China Gerui's conference calls dated March 20, 2014, *id.* ¶¶ 35-39, May 20, 2014, *id.* ¶¶ 40-47, and September 4, 2014.  *Id.* ¶¶ 50-59. Accordingly, the Amended Complaint incorporates these documents by reference and the Court will consider them in deciding the present motion to dismiss.  *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996) ("*Philip Morris*") (concluding "that the District Court was entitled to consider the full text of

---

[5] Plaintiff states that the press release was issued on May 30, 2014, *id.* ¶ 48, while Defendants attached a press release dated May 29, 2014.  Thomas Aff. Ex. 12.  As discussed *infra*, notwithstanding whether the May 29, 2014 press release attached to the Thomas Affidavit is the same as the May 30, 2014 press release referenced in Plaintiff's Amended Complaint, the Court may consider the May 30, 2014 press release in deciding the motion to dismiss.

those documents [partially quoted in the Complaint but considered integral] in ruling on the motion to dismiss").

Regarding the documents not cited to or relied on in the Amended Complaint—the 2013 annual report and the August 28, 2013, May 30, 2013, and January 6, 2015 conference calls—the Court may "take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC")[,] . . . documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law,'" *Silsby*, 17 F. Supp. 3d at 354, and of "press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 570 (citing *Staehr v. Hartford Fin. Serv. Grp., Inc.*, 547 F.3d 406, 425-26 (2d Cir. 2008)). Plaintiff also does not object to the Court's consideration of any of the attached documents. Accordingly, this Court may take judicial notice of the annual report and conference call transcripts attached to Defendants' motion to dismiss but not cited to or relied on in the Amended Complaint.

Plaintiff attaches two document to its Opposition. One document, Edelson's article, Pl.'s Request for Judicial Notice Ex. 2, as stated *supra*, is cited to and relied on in the Amended Complaint. The second document, China Gerui's Form 6-K filed on May 27, 2015, Pl.'s Request for Judicial Notice Ex. 1, has been filed with the SEC, and may be taken into account by the Court in deciding the instant action. *See Silsby*, 17 F. Supp. 3d at 354.

IV.   **Discussion**

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance," 15 U.S.C. § 78j(b), while SEC Rule 10b-5, promulgated thereunder, creates liability for a person

who makes "any untrue statement of a material fact or . . . omit[s] to state a material fact . . . in connection with the purchase or sale of any security." *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) (quoting 17 C.F.R. § 240.10b-5 (1951)).  To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that:  (1) the defendant made a material misrepresentation or omission, (2) with scienter, *i.e.*, a wrongful state of mind, (3) in connection with the purchase or sale of a security, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss.  *Dura*, 544 U.S. at 341-42; *see also, e.g.*, *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Defendants contend that this action must be dismissed in its entirety because Plaintiff fails to adequately plead the existence of actionable omissions or misstatements or a strong inference of scienter.  Defs.' Mem. at 4.  According to Defendants, Plaintiff's underlying claims are not that the Company's statements were false or misleading but that Plaintiff disagrees with the Company's investment decision, which is beyond the purview of the federal securities laws.  *See id.* at 2; *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477-79 (1977).  Defendants also argue that the claims against Edelson should be dismissed because there are no allegations that Edelson made, or controlled anyone that made, the allegedly false or misleading statements.  Defs.' Mem. at 4.

### a.  Section 10(b): Material Misstatement and Omissions

In order to survive a motion to dismiss, Plaintiffs must establish that Defendants "made a statement that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("With respect to misstatements, there are two components to this requirement:  the statement

must be false, and the statement must be material."), *aff'd*, 604 Fed. App'x 62 (2d Cir. 2015).
"A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an
alleged material misstatement was false *at the time it was made*." *In re Lululemon Sec. Litig.*, 14
F. Supp. 3d at 571 (emphasis in original). Furthermore, the Second Circuit has repeatedly
indicated that plaintiffs cannot simply assert that a statement is false—"they must demonstrate
with specificity why . . . that is so." *Rombach*, 355 F.3d at 174.

With respect to material omissions, a defendant's silence is not misleading absent a duty
to disclose. *Basic*, 485 U.S. at 239 n.17. "Disclosure of an item of information is not required,
however, simply because it may be relevant or of interest to a reasonable investor." *Resnik v.
Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). Rather, "[a] duty to disclose arises whenever secret
information renders prior public statements materially misleading, not merely when that
information completely negates the public statements." *In re Time Warner Inc. Sec. Litig.*, 9
F.3d 259, 268 (2d Cir. 1993) ("*Time Warner*"). The parties are not under a duty to disclose
information that is equally available, widely reported, or "so basic that any investor could be
expected to know it." *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F.
Supp. 3d 336, 349 (S.D.N.Y. 2014) (internal citations omitted).

Here, Plaintiff alleges that China Gerui's statements regarding its growth and fiscal
strategies were materially false and misleading for three reasons. *First*, Plaintiff claims that
China Gerui made the decision to purchase the porcelain on or before May 20, 2014, and thus,
any statements regarding its growth or fiscal strategies, or cash reserves made on or after that
date were false or materially misleading. *See* Pl.'s Opp'n Mem. at 5-8, 10. *Second*, Plaintiff
contends, presumably in the alternative, that Defendants' statements were false because the
Purchase never actually occurred and China Gerui concocted the Purchase to attribute its

financial decline to "questionable business judgment" or to "cover up or to facilitate the looting of its assets by insiders."  *Id.* at 2-3; *see also id.* at 1 n.3, 11 n.6.  *Third*, Plaintiff alleges that Defendants had a duty to update its statements once the Company decided to use its cash reserves to allegedly purchase the porcelain in order to avoid misleading investors into believing that it continued to employ "a business strategy comporting with its status as a steel manufacturer" and was in possession of hundreds of millions of dollars in unrestricted cash.  *See id.* at 5-7.  Plaintiff's allegations, however, do not establish that China Gerui's statements were false when made; instead they constitute non-actionable statements of opinion or intent. Whether China Gerui had a duty to update its statements presents a more difficult question. However, the Court ultimately finds the Company was under no such duty.

### i.  Falsity

Plaintiff fails to plausibly allege that China Gerui's statements regarding its growth strategies, fiscal responsibility, and cash reserves were false when made.  Plaintiff relies solely on the argument that the only logical inference from the fact that the alleged Purchase was completed by June 30, 2014 is that China Gerui was in the process of purchasing the Collection on or before May 20, 2014, and thus, statements made after that date regarding its growth and fiscal strategies were false or materially misleading.  *See id.* at 7-8.  As support, Plaintiff identifies the steps China Gerui allegedly would have had to take to finalize the Purchase within six weeks:  (1) being presented with the opportunity to purchase the Collection, (2) identifying an appraiser to conduct due diligence and authenticate the Collection, (3) determining which pieces of the Collection could be sold abroad and the prices of these pieces, (4) determining the impact of the Purchase on the Company's overall viability and on specific lender covenants, and (5) negotiating and closing the Purchase.  *Id.* at 8.  Plaintiff, however, does not allege why these

steps could not plausibly occur within a six week period. Moreover, what is alleged—that the Collection was put up for sale by a private entrepreneur because of his personal financial issues, *see* Am. Compl. ¶ 57; Thomas Aff. Ex. 10—supports the inference that the sale would occur quickly. *See* Thomas Aff. Ex. 10 at 7 (explaining why China Gerui chose to make this Purchase, Meng stated on the September 4, 2014 earnings conference call that "over the last couple of quarters we have looked at acquisitions in related businesses, but it is difficult to make an acquisition when the stock price and the market value of the Company are so low. So, we decided to hold back on those. Instead of trying to buy a few companies or limited companies, for example, we have this opportunity to buy a valuable antiquities porcelain collection at a very attractive price due to the financial price of the order. So, we see this as a viable alternative investment opportunity so we jumped at it."); *see also* Am. Compl. ¶ 56.

Even assuming that by May 20, 2014, China Gerui decided to purchase the Collection, statements made after that date are not inherently false or misleading. In *Philip Morris*, 75 F.3d at 812, the Second Circuit rejected the argument that a company's statement discussing one strategy was "false because the company had already made the decision, or was actively considering adopting a plan" to implement a different strategy. The court explained that "[w]hile it may be reasonable to infer that [the company] began to consider changing its marketing strategy at least a couple of weeks before the plan was presented . . ., the plaintiffs have not alleged circumstances indicating how such consideration would have rendered any of the company's prior statements false" where the company did not make "any statements or predictions foreclosing the possibility of adopting alternative" strategies. *Id.* Likewise, the fact that China Gerui decided to pursue another strategy does not make its earlier statements false.

Plaintiff's only other argument that Defendants' statements were false when made is the allegation that China Gerui previously overstated its cash reserves and concocted the alleged Purchase to explain the decrease in its cash holdings.  *See* Pl.'s Opp'n Mem. at 1-2, 11.  As aptly pointed out by Defendants, this allegation is completely speculative and, in fact, is not made in the Amended Complaint.  *See* Defs.' R. Mem. at 1, 2.  While Plaintiff does not concede that the Purchase occurred—referring to the "purported" or "supposed" purchase in the Amended Complaint, *see* Am. Compl. ¶¶ 4, 5, 8—Plaintiff never alleges that China Gerui overstated its cash holdings or that China Gerui's statements were false or misleading because the Purchase did not occur.  In fact, Plaintiff's allegations that China Gerui's statements were false or misleading are based on the contention that China Gerui touted its cash reserves and certain strategies when it already had decided to purchase the Collection.  *See id.* ¶ 8.  Plaintiff cannot now add new allegations via its memorandum.  *See Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 764 n.4 (S.D.N.Y. 2006) (finding Plaintiff's "allegations are not properly before the Court [because t]he complaint makes no mention of these claims and plaintiffs cannot amend their complaint through a legal memorandum.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

Moreover, even if the Court could read the Amended Complaint to include these allegations, they are based on the conclusory argument that because of "the improbable nature of the transaction itself—a steel company deciding to bet the house on Chinese porcelain"—the Purchase could not have occurred.  Pl.'s Opp'n Mem. at 9.  Plaintiff also contends that the Purchase is "inherently suspect" because China Gerui did not provide certain details about the Collection, including, *inter alia*, photographs of the Collection or its current location, and the fact that the Company waited two months to disclose the alleged Purchase.  *Id.* at 10; *see also id.* at 1-2 ("Had the Company made public any details regarding the Acquisition, one might simply

attribute this Acquisition to questionable business judgment.").  However, even assuming that

these allegations support the inference that the Purchase is "inherently suspect," they do not

plausibly allege that the Purchase did not occur.  Accordingly, Plaintiff fails to state actionable

misstatements or omissions.[6]

## ii.  Non-Actionable Statements[7]

Many of the allegedly false or misleading statements identified by Plaintiffs are also non-

actionable.  For a statement to be actionable, "the representation must be one of existing fact, and

---

[6] To be clear, the Court appreciates the inherent incongruity of a steel manufacturer "jump[ing]" on an opportunity to purchase several hundred million dollars worth of antique porcelain as a hedge "during the transitional phase of steel industry restructuring."  *See* Thomas Aff. Ex. 10; *see also* Am. Compl. ¶¶ 51, 56.  Moreover, in announcing this significant purchase—which utilized essentially the entirety of the Company's unrestricted cash holdings—management provided only the barest of details.  *See* Thomas Aff. Ex. 10; Am. Compl. ¶¶ 3, 59.  The foregoing, coupled with what can charitably be described as a dramatic change in the strategic direction the Company had, through its public statements, purported to be following, provides ample basis on the part of any reasonable shareholder for suspicion of fraud.  To state a claim for securities fraud on the basis of the falsity of the Company's public statements, however, these suspicions must at base be supported by facts that tend to establish that the statements were false when made.  This the Complaint fails to do.

[7] Defendants contend that many of these statements are protected by the PSLRA's safe harbor provision or the common law bespeaks caution doctrine.  Defs.' Mem. at 11-12.  The PSLRA safe harbor provision provides that no liability attaches to certain forward-looking statements that are identified as such and "accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the forward looking statements."  *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 400 (S.D.N.Y. 2006) (citing 15 U.S.C. § 78u–5(c)).  The bespeaks caution doctrine, similarly "refers to the use of cautionary language aimed at warning investors of potential risks that may occur in the future" and provides that where "*no reasonable investor* could have been misled about the nature of the risk when he invested," a claim for securities fraud fails.  *Id.* (emphasis in original).  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."  *Slayton*, 604 F.3d at 772; *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 400 (explaining that under the bespeaks caution doctrine, "effective, cautionary language needs to warn of, or directly relate to, the risk that brought about the plaintiff's loss.").  While many of these statements are properly considered forward-looking statements under the PSLRA, *see* 15 U.S.C. § 78u-5(c)(i)(1)(B) ("a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services" are considered forward-looking statements); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 384-85 (S.D.N.Y. 2012) ("The PSLRA defines forward-looking statements to include, *inter alia*, . . . statements of the plans and objectives of management for future operations . . . and statements of future economic performance." (internal citations and quotations omitted)), *reconsideration granted in part*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012), and were identified as such, *see* Thomas Aff. Exs. 3 at 13, 7 at 3, 8 at 3, 9 at 3, 16 at 3, Defendants have not satisfied their burden of demonstrating that the accompanying cautionary language was meaningful and conveyed substantive information.  Instead, Defendants merely contend that each statement was "accompanied by cautionary language noting that they were forward-looking in nature, that actual results could differ materially from what was predicted, and each was accompanied by meaningful cautionary language discussing the factors that could cause actual results to differ," Defs.' Mem. at 12 (citing Thomas Aff. Exs. 5, 8, 14, 16, 19), without any additional information about how the alleged cautionary language related to the risks that allegedly occurred.  *See In re Nokia*

not merely an expression of opinion, expectation or declaration of intention." *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (quoting *Greenberg v. Chrust*, 282 F. Supp. 2d 112, 121 (S.D.N.Y. 2003)), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 Fed. App'x 250 (2d Cir. 2004) (summary order).  "[G]eneralizations regarding integrity, fiscal discipline and risk management constitute precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282 (SHS), 2007 WL 950132, at *12 (S.D.N.Y. Mar. 29, 2007) (internal quotations and citations omitted)), *aff'd sub nom. ECA*, 553 F.3d at 206 ("JPMC's statements were merely generalizations regarding JPMC's business practices.  Such generalizations are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."); *In re New York Community Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 478-79 (E.D.N.Y. 2006).  However, "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *In re Intl. Bus. Machines Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted); *see also Gissin v. Endres*, 739 F. Supp. 2d 488, 502 (S.D.N.Y. 2010) ("statements are not protected where defendants had no basis for their optimistic statements and already knew (allegedly) that certain risks had become reality").

China Gerui's statements about its fiscal strategy, including, for example, that the Company would "remain fiscally disciplined with its cash resources given the working capital intensive nature of [its] business," Am Compl. ¶ 45; *see also id.* ¶ 38, are generalizations about

---

*Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d at 401.  Moreover, two of the five exhibits cited by Defendants do not contain any identified forward-looking statements or cautionary language.  *See* Thomas Aff. Exs. 14, 19.

its fiscal discipline that are usually considered non-actionable.  *See ECA*, 553 F.3d at 206.

Moreover, Plaintiff makes no allegations that China Gerui made specific commitments regarding

its fiscal strategy or guaranteed that its cash holdings would not be utilized such that these

statements would be actionable.  Accordingly, statements about China Gerui's fiscal strategy are

best considered non-actionable puffery.  *See Lasker v. New York State Elec. & Gas Corp.*, 85

F.3d 55, 59 (2d Cir. 1996) (per curiam) (finding the company's statements that it would not

"compromise its financial integrity" and that it was "commit[ed] to creat[ing] earnings

opportunities" were non-actionable puffery, not guarantees of profitability or promises not to

undertake actions that may impact its finances); *Gissin*, 739 F. Supp. 2d at 512 (finding the

defendant's statement that the company "continues to maintain a strong balance sheet" was mere

puffery because it did not "offer any of the 'long-term guarantees' or specifics which would

convert an opinion or projection into a factual misrepresentation."); *see also In re Intl. Bus.*

*Machines Corporate Sec. Litig.*, 163 F.3d at 108 (finding that the defendant's statement that the

company was not concerned about covering the dividend this quarter was not actionable because

"it contains no long-term guarantee or assurance" and was "an expression of optimism that is too

indefinite to be actionable under the securities laws.").

Similarly, statements regarding China Gerui's optimism that its strategies would be

successful, including, for example, that the Company "*expressed hope* that [it] could be

'transform[ed] . . . into a company with a larger product mix,'" Am. Compl. ¶ 33 (emphasis

added), "*express[ed] that he* [Lu] *believed* the Company's growth strategies would begin to yield

results in the second half of 2014," *id.* ¶ 39 (emphasis added), "*expected* to 'compete in the

higher growth steel markets, provide better solutions for customers and further obtain a larger

market share," *id.* ¶ 42 (emphasis added), are also general statements of corporate optimism.  *See*

*Livingston v. Cablevision Sys. Corp.*, 966 F. Supp. 2d 208, 220 (E.D.N.Y. 2013) (finding statements that a company "'can continue to provide superior products, superior customer service, and compete aggressively, and continue to grow' is quintessential inactionable puffery.").

Whether China Gerui's other statements regarding its strategies—to increase production capacity, expand to overseas markets, diversify outputs, pursue acquisitions or other partnerships, and reserve the Company's cash for its "capital expansion program"—are non-actionable projections or statements of intent or opinion is a closer question.  Plaintiff contends that statements about China Gerui's strategies were sufficiently specific to render them actionable.  Pl.'s Opp'n Mem. at 14-15.  While some of the strategies identified by Plaintiff arguably include specific factual support, many of China Gerui's strategies are discussed only in broad terms.  For example, statements that "the Company would 'diversify [its] revenue stream' by expanding to overseas markets," Am. Compl. ¶ 29, and undertook "efforts to cultivate its exports and expansion into new international markets for its products," *id.* ¶ 36, includes no factual support and cannot be interpreted as guarantees that these strategies would be pursued or, if pursued, would be successful.  *See Frazier v. VitalWorks, Inc.*, 341 F. Supp. 2d 142, 151 (D. Conn. 2004) ("A statement that the company 'believes' its business may go in a particular direction, or that it is 'promoting' a particular business plan, would not be interpreted by a reasonable investor as a promise that the plan will be successful.").  Statements regarding China Gerui's intention to pursue mergers and acquisitions and to reserve its cash for its capital expansion program were also only broadly discussed.  *See, e.g.*, Am. Compl. ¶ 27 ("The Company again noted that it was reserving the use of its cash for [its] capital expansion program."); *id.* ¶ 30 (same); ¶ 34 (same); *id.* ¶ 33 ("the Company was investigating *potential*

'accretive acquisitions and potential joint ventures' as a way of more rapidly diversifying its

product mix and gaining market share." (emphasis added)); *id.* ¶ 31 (China Gerui hired a

consultant to assist in its "development and execution of a global growth, operational and

acquisitions strategy."). Conversely, China Gerui's statements regarding its goal of diversifying

its outputs was arguably supported by specific statements of fact, namely China Gerui's stated

intention to achieve this goal by increasing its laminated and chromium-plated production. *Id.* ¶¶

29, 33, 36, 41. However, even if actionable, as pled, these statements were true—"the utilization

of the Company's chromium plating production lines [rose] from 49% in the fourth quarter of

2013 to 51% in the first quarter of 2014." *Id.* ¶ 42.

### iii.  Duty to Update

Plaintiff also contends that, notwithstanding whether China Gerui's statements were

actionable or false, it had a duty to update these statements once the Company seriously

considered purchasing the Collection and after the Purchase allegedly occurred. Pl.'s Opp'n

Mem. at 5 n.5, 7. "A duty to update may exist when a statement, reasonable at the time it is

made, becomes misleading because of a subsequent event." *In re Intl. Bus. Machines Corporate*

*Sec. Litig.*, 163 F.3d at 110 (citing *Time Warner*, 9 F.3d at 267; *In re Burlington Coat Factory*

*Secs. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997)). There is no duty to update "vague statements

of optimism or expressions of opinion" that "lack the sort of definite positive projections that

might require later correction." *Id.* (citing *Time Warner*, 9 F.3d at 267); *In re Duane Reade Inc.*

*Sec. Litig.*, 2003 WL 22801416, at *7 ("A company has no duty to update forward-looking

statements merely because changing circumstances have proven them wrong."). Moreover, there

is no duty to update non-forward-looking statements unless the statements "contain some factual

representation that remains 'alive' in the minds of investors as a continuing representation." *In*

25

*re Intl. Bus. Machines Corporate Sec. Litig.*, 163 F.3d at 110 (citing *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d at 1432).

Two Second Circuit decisions, *Time Warner*, 9 F.3d 259 and *Philip Morris*, 75 F.3d 801, guide this Court's analysis.  In *Time Warner*, 9 F.3d at 262, the plaintiffs claimed that the company's "highly publicized campaign to find international 'strategic partners' who would infuse billions of dollars of capital into the company," which was $10 billion in debt, were false and misleading because the company failed to disclose its consideration of an alternative method of raising capital.  The Second Circuit held that "when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration."  *Id.* at 268.  The court found that, in this context, "[h]aving publicly hyped strategic alliances, Time Warner may have come under a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light," namely, the consideration of an alternative strategy.  *Id.*

Three years later, the Second Circuit took up the issue again in *Philip Morris*, 75 F.3d 801.  The plaintiffs in *Philip Morris* argued, as Plaintiff does here, that the company had a duty to disclose its consideration of an alternative business plan, before its adoption, in order to prevent its prior statements from being misleading.  *Id.* at 804-05, 808-09.  The Second Circuit acknowledged that the company's consideration of a new marketing plan may be material, but found that the plaintiff's contention that statements including, *inter alia*, "the company's goal of narrowing [ ] the price difference between discount and premium brands," did not create a duty to disclose its consideration of an alternative business plan because "[s]uch statements simply reflected company policy at the time, they were not promises to maintain that policy in the

26

future, and thus were not rendered misleading by the company's subsequent consideration of an alternative plan." *Id.* at 810, 811.  In distinguishing the *Time Warner* decision, the court stated that it "believe[d] that *Time Warner* went nearly to the outer limit of the line that separates disclosable plans from plans that need not be disclosed, and that the allegations of this case are on the safe side of the line." *Id.* at 810 (distinguished statements in *Time Warner* as having "'hyped' a *specific* plan, thereby inducing investors to believe that alternatives were excluded" (emphasis added)); *Frazier*, 341 F. Supp. 2d at 152 (noting that the Second Circuit arguably narrowed *Time Warner* in *Philip Morris*).

Here, in regards to its strategies, China Gerui did not "hype" a specific plan for addressing the declining economy but, over a period of years, identified several potential strategies including, increasing its production capacity, expanding to international markets, diversifying its outputs, and pursuing acquisitions or joint ventures, all in varying detail. *See, e.g.*, Am. Compl. ¶ 29 ("to overcome the challenging environment, the Company would diversify [its] revenue stream by expanding to overseas markets" and would "diversity its outputs."); *id.* ¶ 32 ("to globalize [its] business through accretive acquisitions while continuing to focus on organic growth opportunities."); *id.* ¶ 36. ("'accelerat[e]' its push into higher margin steel products, including laminated steel[,]" "to cultivate its exports and expansion into new international markets for its products[,]" and continue to "actively pursue viable mergers and acquisitions or strategic partnerships that w[ould] enable positive contribution to cash flow, broaden end-user applications, provide [research and development] innovation and complement [its] product portfolio"); *id.* ¶ 41 ("[entering] new products and new markets that will enable the company to regain profitability and preserve [its] integrity with the capital markets."); *id.* ¶ 48 ("doubl[e] capacity, broaden[] its product portfolio, improv[e] efficiency, expand[ the

Company's] market share, and pursu[e] acquisitions and strategic partnerships.").  Plaintiff does not allege that China Gerui stated its intention to adhere exclusively to any one of these strategies or any combination thereof, and, because China Gerui identified many potential strategies, it is unlikely that its statements created the impression that other potential strategies were excluded.

China Gerui also had no obligation to update its statements regarding its unrestricted cash reserves, its intention to use its cash for its capital expansion program, or its intention to remain fiscally disciplined and carefully manage its cash resources.  Statements that the Company planned to remain "fiscally disciplined" or was "carefully manag[ing its] cash resources," *id.* ¶¶ 38, 45, are general pronouncements that do not require updating.  *See In re Intl. Bus. Machines Corporate Sec. Litig.*, 163 F.3d at 110 (finding no duty to update "vague statements of optimism or expressions of opinion" that "lack the sort of definite positive projections that might require later correction."); *c.f. City of Austin Police Retirement Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 308 (S.D.N.Y. 2013), *reconsideration denied* (June 6, 2013) ("By announcing . . . a [development] schedule, [defendant] made the sort of definite positive projection that the Second Circuit has found require[s] later correction when intervening events render it misleading." (internal quotations and citations omitted)).  Moreover, given China Gerui's identification of multiple strategies for addressing the declining steel industry, its statements regarding its cash reserves cannot be interpreted as a guarantee or representation that it would not at some point use its cash holdings.

China Gerui also had no duty to disclose the alleged June 30, 2014 Purchase, which it disclosed at its regularly scheduled quarterly earnings announcement on September 4, 2014, earlier than it did.  Plaintiff contends that the alleged Purchase represented a "dramatic" change in China Gerui's strategy and thus, should have been disclosed to avoid making prior

statements—which according to Plaintiff created the impression that the Company intended to achieve its stated goals and possessed significant cash reserves to do so—misleading. *See* Pl.'s Opp'n Mem. at 6-7. Plaintiff identifies no statements made between June 30, 2014 and September 4, 2014 that were misleading because of the allegedly delayed disclosure.[8] Accordingly, for an obligation to exist, disclosure of the Purchase must have been necessary to prevent China Gerui's pre-Purchase statements from being misleading. This Court, however, already determined that China Gerui's consideration of an alternative strategy did not make its statements regarding its other strategies false or misleading. In this context, where the Company's previous statements concerned its general intention to utilize multiple strategies, its ultimate adoption of an alternative strategy does not render its prior statements misleading. Because Plaintiff failed to adequately allege that the Purchase rendered any statements misleading, China Gerui was under no duty to update its previous statements.

> **b.  Section 10(b): Scienter**

"[W]hile § 10(b) has been described and may have been contemplated as a 'catchall' provision, 'what it catches must be fraud.'" *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 413 (S.D.N.Y. 2001) (quoting *Chiarella v. U.S.*, 445 U.S. 222, 234-35 (1980)). Section 10(b) and Rule 10b-5 require plaintiffs to allege a state of mind demonstrating "an intent to deceive, manipulate or defraud," also known as scienter. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also, e.g., In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y.

---

[8] Plaintiff identifies China Gerui's announcement on September 2, 2014 that Wong resigned from the Board of Directors due to his personal health problems as suspect because Wong was required to run for reelection in 2014 and instead chose to resign. *See* Am. Compl. ¶ 49. Plaintiff, however, does not assert that this statement was false or misleading as a result of the alleged Purchase on June 30, 2014.

2004).  To satisfy the PSLRA's pleading requirements for scienter, a plaintiff must allege facts

with particularity that would give rise "to a strong inference that the defendant acted with the

required state of mind."   *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(2)(A)) (internal

quotation marks omitted).  As Supreme Court precedent dictates, a "strong inference" that a

defendant acted with a certain intent is one that is "more than merely plausible or reasonable—it

must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent."

*Tellabs*, 551 U.S. at 314 (emphasis added).  This inquiry goes beyond the ordinary Rule 9(b)

framework and requires courts to consider "not only inferences urged by the plaintiff . . . but also

competing inferences rationally drawn from the facts alleged."  *Id.*

"When the defendant is a corporate entity . . . the pleaded facts must create a strong

inference that someone whose intent could be imputed to the corporation acted with the requisite

scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc*., 531 F.3d 190,

195 (2d Cir. 2008).  The "most straightforward way to raise such an inference for a corporate

defendant" in most cases is "to plead it for an individual defendant," however, there may be

some instances where a plaintiff may allege scienter as to a corporate defendant without also

alleging scienter as to an individual defendant.  *Id*.; *Vining v. Oppenheimer Holdings Inc*., No. 08

Civ. 4435 (LAP), 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010) ("a plaintiff can raise an

inference of corporate scienter by establishing scienter on behalf of an employee who acted

within the scope of his employment.") (internal citation omitted).  "A strong inference of

corporate scienter may also be appropriate 'where a corporate statement is so important and

dramatic that it would have been approved by corporate officials sufficiently knowledgeable

about the company to know that the announcement was false.'"  *In re Gentiva Secs. Litig.*, 932 F.

Supp. 2d 352, 384 (S.D.N.Y. 2013) (citing *Vining*, 2010 WL 3825722, at *13).

A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006). The relevant inquiry for the Court "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 291-92 (S.D.N.Y. June 23, 2014) (citing *Tellabs*, 551 U.S. at 322-23) (emphasis original); *see also ECA*, 553 F.3d at 198; *Medis Inv. Grp. v. Medis Tech., Ltd.*, 586 F. Supp. 2d 136, 141 (S.D.N.Y. 2008) ("In order to determine whether a complaint has adequately pleaded scienter, a court should examine all of the facts alleged collectively or 'holistically' (without parsing individual allegations), and take into account any inference concerning scienter—supporting or opposing—which can be drawn from the complaint."), *aff'd,* 328 Fed. App'x 754 (2d Cir. 2009) (summary order). "According to the Supreme Court, the critical inquiry is: '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?' If so, then scienter has been adequately pleaded. If not, the case may be dismissed." *Medis Inv. Grp.*, 586 F. Supp. 2d at 141 (citing *Tellabs*, 551 U.S. at 326).

Here, Plaintiff relies solely on "circumstantial evidence of conscious misbehavior or recklessness" to establish scienter. Pl.'s Opp'n Mem. at 8-9. "Where the plaintiff pleads scienter by conscious misbehavior or recklessness rather than motive, 'the strength of the circumstantial allegations must be correspondingly greater.'" *Medis Inv. Grp.*, 586 F. Supp. 2d at 141-42 (citing *Kalnit,* 264 F.3d at 142); *see also In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (noting that "the strength of the recklessness allegations must be

greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences." (emphasis in original)).

In order to establish scienter under the conscious misbehavior theory, Plaintiff "must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (quoting *Kalnit*, 264 F.3d at 142) (internal quotation marks omitted). To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must "specifically identify the reports or statements containing this information." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d at 659 (citing *Dynex*, 531 F.3d at 196). "Recklessness in the scienter context[, however,] cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005); *Medis Inv. Grp.*, 586 F. Supp. 2d at 142 ("To properly allege recklessness, the plaintiff must plead 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'"). Moreover, "unlike statements about historical facts, in which the scienter inquiry focuses on whether the defendants 'knew facts or had access to information suggesting that their public statements were not accurate' or 'failed to check information they had a duty to monitor,' the recklessness inquiry as to forward-looking projections focuses on whether the defendants knew at the time they made these projections that they were unrealistic or unlikely to come true." *City of Austin Police Retirement Sys.*, 957 F. Supp. 2d at 301 (citing *ECA*, 553 F.3d at 199; *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 153-54 (S.D.N.Y. 2004)).

Here, Plaintiff essentially argues that it has pled a strong inference of scienter because, as discussed *supra* at Section IV.a.i, it is implausible that a steel manufacturer would take a

significant portion of its cash reserves during an economic decline to purchase Chinese antiquities as a means of addressing its declining financial situation.  Thus, Plaintiff argues the most reasonable inference is that China Gerui did not actually purchase the Collection but instead concocted the Purchase as a way to explain its prior overstated cash holdings.  *See* Pl.'s Opp'n Mem. at 11.  Plaintiff relies on the following circumstantial evidence as support:  (1) the "improbable nature" of the Purchase, *id.* at 9-10; (2) the timing of the Purchase:  China Gerui purchased the porcelain for $234 million, leaving the company with $3 million in unrestricted cash, six weeks after discussing its goals and the importance of maintaining its fiscal discipline, *id.* at 10-11, and; (3) China Gerui's alleged failure to disclose details of the Purchase including: when exactly the Collection was purchased, the seller's or appraiser's identity, the Collection's insurance status, photographs of the Collection, or an opinion of the Company's auditor and legal counsel concerning the Purchase.  *Id.* at 10.

The above allegations, however, are only tenuously connected to Plaintiff's allegations of fraud, which are based on the claim that Defendants deceived investors about its growth and fiscal strategies and its cash reserves by failing to disclose its consideration of and ultimate alleged purchase of the porcelain.  Plaintiff's new theory—that China Gerui concocted the Purchase to cover up the fact that its cash reserves were overstated—is not alleged in the Amended Complaint and Plaintiff improperly attempts to add these new allegations through its memorandum.  *See Goplen*, 453 F. Supp. 2d at 764 n.4 ("plaintiffs cannot amend their complaint through a legal memorandum.").  Notwithstanding this new and wholly speculative theory, Plaintiff fails to plead a strong inference that Defendants intended to defraud or mislead investors based on either of its theories.

Plaintiff's allegation that the nature of the Purchase is improbable and therefore, was part of an alleged cover up, is conclusory.  The fact that China Gerui has not disclosed additional details of the Purchase at most raises admittedly serious questions about the business judgment of Defendants but does not plausibly allege that it did not occur or support a strong inference of scienter.

The only allegation related to Plaintiff's original theory, that China Gerui could not plausibly have finalized the Purchase in six weeks and thus, was not really pursuing the strategies it was publically discussing during that time, has already been rejected by this Court. *See supra* at Section IV.a.i.  Likewise, Plaintiff's contention that China Gerui's "failure to disclose the disposal of such a significant percentage of the Company's assets [to purchase the Collection] is such a gross oversight that fraudulent intent must be presumed," Pl.'s Opp'n Mem. at 12, also fails.  Plaintiff identifies no support for this proposition, nor any particularized facts or allegations that Defendants' decision to disclose the Purchase during its regularly scheduled announcement of second quarter earnings was reckless or resulted in any benefit to the Company or the Individual Defendants.  Accordingly, "[t]o sustain this complaint on the conscious misbehavior standard would . . . confer. . . a license" "to base claims of fraud on speculation and conclusory allegations."  *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Properties, Inc.*, 921 F. Supp. 1174, 1183-84 (S.D.N.Y. 1996).

Viewing the allegations holistically, the inference that China Gerui relied on the Purchase to avoid alerting investors to its true viability is not "as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314; *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008).  The facts alleged in the Amended Complaint suggest that the Company used its unrestricted cash to invest in valuable antique porcelain as a hedge against

34

the continuing contraction of the Chinese steel industry.  Plaintiff has made no particularized allegations to suggest that China Gerui did not hold such a belief.  And as unorthodox as such an investment may be, this nonfraudulent justification is at least as compelling as the inference of fraudulent intent Plaintiff would have the Court draw.  To the extent that Plaintiff contends that this decision was improper, allegations of corporate mismanagement cannot form the basis of a securities fraud claim.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 562 (finding plaintiff's allegations that the company could have done more to discover defects in its product required the Court "to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud.") (citing *Santa Fe*, 430 U.S. at 477-79); *see also Santa Fe*, 430 U.S. at 477 (refusing to construe Section 10(b) to prohibit "instances of corporate mismanagement").  Conversely, the basis for Plaintiff's inference that China Gerui intentionally deceived investors to avoid alerting them to the Company's "true condition"—that its cash reserves were overstated—is not alleged in the Amended Complaint and Plaintiff makes no particularized allegations supporting such an inference.

In sum, Plaintiff's allegations do not demonstrate that China Gerui intended to deceive or mislead investors about its viability through its statements regarding its fiscal and growth strategies, its cash reserves, or the alleged Purchase.  Because the Amended Complaint does not raise a strong inference of scienter, Plaintiff's §10(b) claim fails.

## V.   Section 10(b): The Individual Defendants

The claims against Edelson and the non-moving Individual Defendants fail for the same reasons that the claims against China Gerui fail.  In regards to the non-moving Individual Defendants, this Court has the power to dismiss a complaint against them, so long as it is exercised cautiously and on notice.  *See Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir.

1994) (affirming the district court's dismissal of a claim against a defendant who neither filed an

appearance nor moved for dismissal since plaintiff was on notice from motion of other

defendants and had an opportunity to be heard); *see also Alki Partners, L.P. v. Vatas Holding*

*GmbH*, 769 F. Supp. 2d 478, 499 (S.D.N.Y. 2011) (dismissing §§ 10(b) and 20(a) claims against

an individual defendant who did not appear in the case or join in the other defendants' motions

because the plaintiffs' claims against him failed for the same reasons they failed against the other

defendants), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 Fed. App'x 7 (2d Cir. 2012)

(summary order).  Although only Edelson has been served, *see* Doc. 37, China Gerui's motion

put Plaintiff on notice of the grounds for dismissal and Plaintiff was afforded an opportunity to

respond.   Plaintiff has not established the existence of material misstatements or omissions or

scienter.  *See supra* at Section IV.a.i-iii, IV.b.  These deficiencies are fatal to Plaintiff's §10(b)

claims against China Gerui and the Individual Defendants alike.  Therefore, Plaintiff's § 10(b)

claim against Edelson and the non-moving Individual Defendants is dismissed.

**VI.     Section 20(a)**

Plaintiff also brings claims against the Individual Defendants under § 20(a) of the

Exchange Act, which imposes liability on individuals who control any person or entity that

violates § 10.  *See* Am. Compl.  ¶¶ 92-97; *see also* 15 U.S.C. § 78t(a).  "To assert a *prima facie*

case under Section 20(a), a plaintiff 'must show a primary violation by the controlled person and

control of the primary violator by the targeted defendant, and show that the controlling person

was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled

person.'"  *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*,

811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1472 (2d Cir. 1996)), *aff'd sub nom. Frederick v. Mechel OAO*, 475 Fed. App'x 353 (2d

Cir. 2012) (summary order).  Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiff has failed to allege a primary violation under § 10(b).  *See Rombach*, 355 F.3d at 178 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, these secondary claims must also be dismissed."); *see also Mechel*, 811 F. Supp. 2d at 859 n.4, 882 (dismissing §20(a) claims against individual defendants who resided in Russia and had therefore not been served with the complaint nor joined the company's motion to dismiss).

## VII.   Leave to Amend

China Gerui requests that this Court dismiss Plaintiff's action with prejudice.  Defs.' Mem. at 20; *see also* Defs.' R. Mem. at 10.  Plaintiff conversely requests that if the Court grants China Gerui's motion to dismiss, that the Court also grant Plaintiff leave to amend the Amended Complaint to add allegations regarding, *inter alia*:  "the Company's scuttling of acquisitions proposed to it by Cambelle. . . ; its intention, as early as March 2014, to acquire the Collection; Edelson's service as an investor liaison for the Company; Edelson's decision to cast a vote in favor of the Acquisition because voting against it would have been futile; doubts that 'Class A certified China arts appraisers' refers to an actual company or to a type of qualification; rampant fraud in the market for Chinese antiquities; and the lack of insurance on the Collection."  Pl.'s Opp'n Mem. at 20.

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  FED. R. CIV. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).  The "usual practice" in this Circuit upon granting a motion to dismiss is to permit amendment of the complaint.  *See Special Situations Fund III QP, L.P. v. Deloitte Touche*

*Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 446-47 (S.D.N.Y. 2014) (citing *Ronzani v. Sanofi S.A.*,

899 F.2d 195, 198 (2d Cir. 1990)).  "[W]here the possibility exists that the defect can be cured,

leave to amend at least once should normally be granted unless doing so would prejudice the

defendant."  *Laborers Local 17 Health and Ben. Fund v. Philip Morris, Inc.*, 26 F. Supp. 2d 593,

605 (S.D.N.Y. 1998) (citing *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991)); *see

also ATSI Comms., Inc.*, 493 F.3d at 108 (2d Cir. 2007) (noting that "courts typically grant

plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under

Rule 9(b)" but denying leave to amend where the plaintiff was already given that opportunity);

*Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are

almost always dismissed with leave to amend.")).  While Plaintiff has amended once as a matter

of right, Plaintiff has not been granted leave to amend.[9]  *See Ronzani*, 899 F.2d at 198 (finding

the district court abused its discretion in dismissing the complaint without granting leave to

amend where the plaintiff "had not previously been given leave to amend"—although the

original complaint was amended once pursuant to Rule 15(a) as a matter of course—and had

offered to amend the complaint).  Because it is possible that Plaintiff can plead additional facts to

remedy the deficiencies identified in this opinion without prejudice to Defendants, Plaintiff is

granted leave to amend.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

160, 189-90 (2d Cir. 2015) (finding the "district court exceeded the bounds of its discretion in

denying Plaintiffs leave to amend their complaint" because an amended complaint "may cure the

remaining defects" identified by the court).

---

[9] At the pre-motion conference the Court did not determine whether dismissal, if granted, would be final.  *Cf. Sinay v. CNOOC Ltd.*, No. 12 Civ. 1513 (KBF), 2013 WL 1890291, at *10 (S.D.N.Y. May 6, 2013) (dismissing complaint with prejudice where, at pre-motion conference, court explicitly stated that any ruling on pending motion to dismiss would be with prejudice), *aff'd*, 554 Fed. App'x 40 (2d Cir. 2014) (summary order).

**VIII.     Motion to Lift the PSLRA's Automatic Stay**

Pursuant to the PSLRA:  "In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."  15 U.S.C. § 78u-4(b)(3)(B).  The instant opinion and order resolves the pending motion to dismiss.  Accordingly, Plaintiff's motion to lift the automatic stay is denied as moot.  *See In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 581 (S.D.N.Y. 2011); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *24 (S.D.N.Y. Aug. 9, 2005) (citing *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 288 (E.D.N.Y. 2002)).

## IX.    Conclusion

For the reasons set forth above, China Gerui's motion to dismiss is GRANTED without prejudice and Plaintiff's motion to lift the automatic stay is DENIED as moot.  Plaintiff's Second Amended Complaint shall be filed, if at all, on or before January 22, 2016.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 23 and 31.[10]

It is SO ORDERED.

Dated:    December 23, 2015
          New York, New York

                                                    Edgardo Ramos, U.S.D.J.

---

[10] The PSLRA requires the Court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1).  Neither the claims nor defenses were harassing or frivolous.  All factual contentions had evidentiary support or were reasonably based on belief or a lack of information.  Furthermore, China Gerui did not affirmatively allege any improper conduct or move for sanctions.  In accordance with the PSLRA, the Court finds that the parties and counsel in this matter have complied with Rule 11(b).